David D. Lin (DL-3666)
david@iLawco.com
Justin Mercer (JM-1954)
justin@iLawco.com
LEWIS & LIN, LLC
45 Main Street, Suite 608
Brooklyn, NY 11201
Tel: (718) 243-9323
Fax: (718) 243-9326

*Counsel for Plaintiff TheECheck.com, LLC*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THEECHECK.COM, LLC,<br><br>      *Plaintiff*,<br><br>  v.<br><br>NEMC FINANCIAL SERVICES GROUP INC., CYBERBOX TECHNOLOGY, INC., ELLINGTON PICHARDO, PRESLEY MARTINEZ and OJAY MARTINEZ-GIL,<br><br>      *Defendants*. | Case No: 1:16-cv-08722-PKC<br><br><br>**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT** |

**INTRODUCTION**

On or about November 9, 2016, Plaintiff THEECHECK.COM, LLC ("TheECheck.com" or "Plaintiff") brought this action pursuant to the federal Lanham Act and New York State common law for the malicious, willful and unlawful publication in this District of false, misleading, disparaging and defamatory statements by Defendants regarding Plaintiff and its electronic check and credit processing services. Then, on November 21, 2016, Plaintiff served defendant NEMC FINANCIAL SERVICES GROUP INC. ("NEMC") and CYBERBOX TECHONOLOGY, INC. ("Cyberbox", together with New Era Financial, "Defendants") with the Complaint and official Summons in this matter, such that their time to file and serve an answer

1

or motion under Fed. R. Civ. P. 12 would expire within 21 days from the date service was complete (i.e., by January 3, 2017). However, Defendants did not file any answer, motion, or take any action or file any document that indicated its intent to answer the suit, or otherwise defend. The time for Defendants to file a response to the suit has expired. Upon information and belief, Defendants are not an infants or incompetent persons, and are not currently in the military service. Consequently, the Clerk of this Court entered a default against Defendants on February 13, 2017.

Based on the foregoing, all papers previously filed herein and the following points and authorities, Plaintiff respectfully requests that this Court grant its Motion for Default Judgment against Defendants NEMC FINANCIAL SERVICES GROUP INC. and CYBERBOX TECHONOLOGY, INC. Specifically, Plaintiff requests the Court award (i) judgment against Defendant NEMC for breach of the MSA Agreement and in favor of Plaintiff in the amount of $60,000 with interest thereon from July 30, 2012, (ii) a permanent injunction against both Defendants from disparaging or otherwise posting defamatory comments about Plaintiff, (iii) a directive to both Defendants to undertake remedial efforts to restore Plaintiff's reputation, including but not limited to taking down and de-indexing the false defamatory statements, (iv) attorneys' fees and costs against Defendant Cyberbox pursuant to the ISO Agreement, and (v) such other relief as the Court deems just and proper.

## STATEMENT OF FACTS

TheECheck.com is engaged in the business of commercial, electronic check and credit processing services for high risk merchants. Complaint ("Compl.") at ¶ 16; Declaration of Ashley Nguyen dated March 7, 2017 ("Nguyen Decl.") at ¶ 3. TheECheck.com is a leading worldwide market provider of secure transaction processing solutions for business-to-consumer

and business-to-business electronic commerce. *Id* at ¶ 17; Nguyen Decl. at ¶ 4. TheECheck.com provides turnkey Internet billing solutions to sellers of web site content and on-line vendors of services and products that add exceptional value to both the user and the merchant. *Id.*; Nguyen Decl. at ¶ 5. TheECheck.com's focus is on processing payments on behalf of vendors and to help them originate other means to generate additional online revenue. *Id.*; Nguyen Decl. at ¶ 5.

TheECheck.com supports its customers by providing global sales management, risk & compliance, tech support, consumer verification services, and accounting platforms. Compl. at ¶ 18. TheECheck.com's flagship service is its electronic check and credit processing services for businesses, offering real time credit card payment processing, premium online payment security, and worldwide payment acceptance abilities. *Id* at ¶ 19. TheECheck.com's services and employees have received top industry certifications and is a member of the Electronic Transactions Association ("ETA"), the leading trade association for the payments industry, representing nearly 550 companies worldwide involved in electronic transaction processing products and services. *Id* at ¶ 20. TheECheck.com has also received an "A+" rating from the Better Business Bureau. *Id* at ¶ 21.

**Defendants' Wrongful Conduct**

Defendant NEMC is a telemarketing business operating in New York and Florida, and is controlled and dominated by its single group of owners, individual defendants Pichardo, Presley and Ojay. Compl. at ¶ 22. Upon information and belief, NEMC owns, operates and/or controls competing credit processing services known as "NEMC", "NEMC Financial", and/or "World Credit Express." *Id* at ¶ 23. Upon information and belief, Defendant Cyberbox is a telemarketing business and merchant payment processes business operating in New York, and is controlled and dominated by the same single group of owners, defendants Pichardo, Presley and Ojay. *Id* at ¶

24.

Beginning in or around 2013 and continuing to the present, in an intentional effort to divert business away from Plaintiff and toward Defendants, and to cause injury to Plaintiff, Defendants began to contact Plaintiff's potential customers in an effort to dissuade Plaintiff's potential customers from doing business with Plaintiff. Compl. at ¶ 25; Nguyen Decl. at ¶ 6. In particular, Defendants have posted taunting material and defamatory statements, authored by Defendants Pichardo, Presley and/or Ojay, about Plaintiff and Plaintiff's services on various forums, blogs and websites across the Internet. *Id.* at ¶ 26. Defendants, writing under the name "NEMC – New York, New York," authored a harassing and defamatory complaint on RipoffReport.com, purportedly to convey factual information about Plaintiff and its services, but instead which asserted outright falsehoods. *Id.* at ¶ 27, Exhibit A; Nguyen Decl. at ¶ 7. Among other claims, the Ripoff Report complaint accuses Plaintiff of unlawfully detaining and/or stealing Defendants' funds, claims Plaintiff committed fraudulent acts to "intimidate people," and calls Plaintiff a "crook" and "ripoff artists." *Id.*

Each of those statements made in the Ripoff Report are false and defamatory. Compl. at ¶ 28; Nguyen Decl. at ¶ 9. Defendants knew, or should have known, that the statements were false when made. *Id.* at ¶ 29; Nguyen Decl. at ¶ 9. The above statements are knowingly and materially false, and were made to defame Plaintiff and divert Plaintiff's customers to Defendants. *Id.* at ¶ 29; Nguyen Decl. at ¶ 11.

Upon information and belief, the Ripoff Report website contains additional false and defamatory comments solicited by the false and defamatory statements made by Defendants. *Id.* at ¶ 30. Indeed, because those comments are also signed "Nemc," Plaintiff believes that Defendants added these false comments in such a fashion that no reasonable person would

4

believe that the statements made therein were opinion, but rather statements of fact about Plaintiff and Plaintiff's services. *Id.* at ¶ 30; Nguyen Decl. at ¶ 9.

In addition to the Ripoff Report being available online and accessible to millions of Plaintiff's current and potential customers, upon information and belief, Defendants published the content of the Ripoff Report to hundreds of third parties, including individuals and entities in which Plaintiff maintains existing contractual relationships. Compl. at ¶ 31; Nguyen Decl. at ¶¶ 16-22. Upon information and belief, Defendants engaged in the above conduct in order to induce Plaintiff's customers to stop doing business with Plaintiff. *Id.* at ¶ 32; Nguyen Decl. at ¶ 17.

Defendants made the above statements as part of an intentional, malicious and systematic campaign to interfere with Plaintiff's contractual relationships with its customers and vendors, and upon information and belief, to wreak havoc on Plaintiff's business by inducing Plaintiff's customers and prospective partners to cease doing business with Plaintiff. Compl. ¶¶ 32-37; Nguyen Decl. at ¶ 19.  As a direct and proximate result of Defendants' defamatory conduct described herein, a number of Plaintiff's customers have refused to start and/or continue business with Plaintiff. Compl. at ¶ 36; Nguyen Decl. at ¶ 20.

Upon information and belief, Defendants Pichardo, Presley and/or Ojay have carried out the aforesaid acts at the direction of, on behalf of, and with full knowledge of NEMC—for their own personal benefit as sole owners of NEMC. *Id.* at ¶ 33. This Ripoff Report complaint by Defendants is egregious because it represents a pattern of making false statements about Plaintiff over a period of multiple years. *Id.* at ¶ 34.  Defendants' conduct is willful and malicious. *Id.* at ¶ 35. Defendants' unlawful conduct is causing and will continue to cause harm to Plaintiff and its services. *Id.* at ¶ 36.

**Defendants' Contractual Breaches**

As stated above, Defendants are disgruntled ex-merchant businesses and independent sales affiliates, who fabricated the claims in the Ripoff Report, upon information and belief, to obfuscate their own fraudulent practices with TheECheck.com. Compl. at ¶ 38.

Before Plaintiff discovered that Defendants were the driving forces behind the authoring of the lies and reputational/character assaults above, on or about April 2, 2012, Defendant Pichardo executed an Independent Sales Office Agreement on behalf of Defendant Cyberbox with Plaintiff (the "ISO Agreement"). *Id.* at ¶ 39, Exhibit B; Nguyen Decl. at ¶ 12.

Pursuant to the ISO Agreement, and in exchange for a fee, Defendant Cyberbox was to market TheECheck.com's electronic payment and collection services to prospective merchants and refer said customers to Plaintiff. *Id.* at ¶ 40, Exhibit B. Under the ISO Agreement, Defendant Cyberbox agreed to confidentiality and non-compete/non-circumvention clauses with TheECheck.com. *Id.* at ¶ 41, Exhibit B. Cyberbox agreed not to compete with TheECheck.com by interfering with Plaintiff's business or contacting Plaintiff's customers or merchants. *Id.* Cyberbox further agreed to keep confidential and not disclose certain customer and proprietary information. *Id.* During all relevant times, Plaintiff paid Defendants for its services under the ISO Agreement. *Id.* at ¶ 42; Nguyen Decl. at ¶ 12.

As stated above, Defendants began a smear campaign intended to drive Plaintiff out of business. Upon information and belief, Defendants began steering Plaintiff's customers (some of whom Defendants may have been privy to solely due to the ISO Agreement) to Defendants' competing business, "NEMC Financial" and/or "World Credit Express" by making false, disparaging and defamatory statements concerning Plaintiff to third parties on the Internet via various review sites, such as RipoffReport.com. *Id.* at ¶ 43; *see* Compl., Exhibit A.; Nguyen

Decl. at ¶ 6. Defendants were well aware that such statements were false when made, as they were privy to Plaintiff's business practices as a sales affiliate and referral agent. *Id.* at ¶ 44; Nguyen Decl at ¶ 11. Upon information and belief, Defendants retained and disseminated other confidential information to both Plaintiff's merchants and the public. *Id.* at ¶ 45; Nguyen Decl at ¶ 12.

Around the same time that Defendant Pichardo executed the ISO Agreement on behalf of Defendant Cyberbox, he also executed a Merchant Services Agreement on behalf of Defendant NEMC on or around April 20, 2012 (the "MSA"). Compl. at ¶ 46, Exhibit C; Nguyen Decl at ¶ 13. According to the terms of the MSA, Defendant NEMC became indebted to Plaintiff for over $100,000 at various times for Plaintiff's services and or fees set forth therein. *Id.* at ¶ 47; Nguyen Decl at ¶ 14. Defendant NEMC thereafter defaulted in the payment obligations due on and after July 30, 2012. *Id.* at ¶ 48; Nguyen Decl at ¶ 14. As of the date of this motion, Defendant NEMC is currently indebted to Plaintiff in the amount of $60,000. *Id.* at ¶ 49; Nguyen Decl at ¶ 15. To date, Defendant NEMC has not remitted all of the requisite payments due under the MSA to Plaintiff. *Id.* at ¶ 50; Nguyen Decl at ¶ 15.

Plaintiffs then filed the instant action on November 9, 2016. On November 21, 2016, Plaintiff served a copy of the Summons and Complaint upon Defendants pursuant to Fed. R. Civ. P. 4(g) and N.Y. BCL § 307, such service was complete on December 11, 2016 (10 days after Plaintiff filed the respective affidavits of service). *See* N.Y. BCL § 307(c)(1); *see also* Affirmation of Justin Mercer dated March 7, 2017 ("Mercer Aff."), ¶ 3. As of the date of this motion, Defendants have failed to file an answer or otherwise defend themselves herein. *See* Mercer Aff., ¶ 4. As a result, the clerk of this Court entered default against Defendants on February 13, 2017. *See* Mercer Aff., ¶ 7.

**ARGUMENT**

A.    **Legal Standard for Entry of Default Judgment**

Pursuant to Fed. R. Civ. P. 12(a)(1)(A), a defendant must serve an answer within 21 days after being served with the summons and complaint. If the defendant fails to plead or otherwise defend, the clerk must enter a default against that party. Fed. R. Civ. P. 55(a). Once the clerk has issued a certificate of default, the moving party may apply for entry of default judgment pursuant to Fed. R. Civ. P. 55(b)(2). In the Second Circuit, defendants are deemed to have admitted the unchallenged factual allegations in the Complaint by virtue of their default, except those relating to the amount of damages. *See Joe Hand Promotions, Inc. v. El Norteno Rest. Corp.*, No. 06 Civ 1878, 2007 WL 2891016, at *2 (E.D.N.Y. Sept. 28, 2007) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); Fed. R. Civ. P. 8(b)(6); 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure § 2688*, at 58-59 (3d ed. 1998).

That, however, is not the end of the inquiry. In determining whether to enter a default judgment, courts in the Second Circuit consider the following factors: "1) whether the defendant's default was willful; 2) whether defendant has a meritorious defense to plaintiff's claims; and 3) the level of prejudice the non-defaulting party would suffer as a result of the denial of the motion for default judgment." *Reliance Communications LLC v. Retail Store Ventures, Inc.*, No. 12 Civ.2067, 2013 WL 4039378, at *2 (E.D.N.Y. Aug. 7, 2013) (citing *Mason Tenders Dist. Council v. Duce Constr. Corp.*, No. 02 Civ. 9044, 2003 WL 1960584, at *2 (S.D.N.Y. Apr. 25, 2003)); *see also O'Callaghan v. Sifre,* 242 F.R.D. 69, 73 (S.D.N.Y. 2007) (holding courts may consider "numerous factors, including whether plaintiff has been substantially prejudiced by the delay involved and whether the grounds for default are clearly

established or in doubt") (internal quotations and citation omitted); *U.S. v. DiPaolo*, 466 F. Supp. 2d 476, 482 (S.D.N.Y. 2006) (grounds for default judgment established by defendant's failure to answer complaint, particularly where the defendant had expressed no intention to answer at a later time).

### 1. *Defendants' Default was Willful*

An unexplained failure to answer a complaint is generally sufficient to establish willfulness. *See Elgard Corp. v. Brennan Const. Co.*, 248 F.App'x. 220, 222 (2d Cir. 2007); *Indymac Bank v. Nat'l Settlement Agency, Inc.*, No. 07 Civ. 6865, 2007 WL 4468652, at *1 (S.D.N.Y. Dec. 20, 2007)*; Empire State Carpenters Welfare v. Darken Architectural Wood*, No. 11 Civ. 46, 2012 WL 194075, at *3 (E.D.N.Y. Jan. 17, 2012). Here, Plaintiff served Defendants a copy of the Summons and Complaint on November 21, 2016, pursuant to Fed. R. Civ. P. 4(g) and N.Y. BCL § 307. *See* Mercer Aff., ¶ 3. Pursuant to that service, Defendants received a total of 43 days to file an answer to the complaint. *See* Mercer Aff., ¶ 4. However, more than 100 days have passed from the date that Plaintiff served Defendants the summons and complaint, and they did not file any answer, motion, or take any action or file any document. *See* Mercer Aff., ¶ 6. Where a defendant elects not to answer a complaint, such behavior should be interpreted as willful. *See Commercial Bank of Kuwait v. Rafidain Bank*, 15 F. 3d [238] 243-44 (2d Cir. 1994) (defendant has been found willful where the defendant failed, for untenable reasons, to answer the complaint). In this instance, Defendants' default is demonstrably willful.

### 2. *Lack of Meritorious Defense*

As Defendants have not responded to the Complaint, not only is Plaintiff unaware of any meritorious defense, but also Defendants have not asserted any such defense. *See, e.g., Indymac Bank v. Nat'l Settlement Agency, Inc.*, No. 07 Civ. 6865, 2007 WL 4468652, at *1 (S.D.N.Y.

Dec. 20, 2007) (plaintiff's allegations deemed admitted where defendant presented no defense); *Empire State Carpenters Welfare v. Darken Architectural Wood*, No. 11 Civ. 46, 2012 WL 194075, at *3 (E.D.N.Y. Jan. 17, 2012) (same); *Mack Fin. Servs. V. Poczatek*, No. CV-10-3799, 2011 WL 4628695, at *4 (E.D.N.Y. Aug. 30, 2011) (same); *Hanley-Wood LLC v. Hanley Wood LLC*, 783 F. Supp. 2d 147, 153 (D.D.C. 2011) (granting default judgment on trademark infringement and under ACPA where defendants were "totally unresponsive."). Given that the Defendants have presented no defense despite being properly served, it is reasonable to infer that Defendants were aware of the deadline for asserting a defense and elected not to do so. As such, the second factor weighs in favor of granting default judgment to Plaintiff.

### *3. Prejudice to Plaintiff*

Plaintiff would be prejudiced if a default judgment is not granted, "as there are no additional steps available to secure relief in this Court." *Mack Fin. Servs. V. Poczatek*, No. CV-10-3799, 2011 WL 4628695, at *4 (E.D.N.Y. Aug. 30, 2011) (quoting *Bridge Oil Ltd. v. Emerald Reefer Lines, LLC*, No. 06-CV-14226, 2008 WL 5560868, at *2 (S.D.N.Y. Oct. 27, 2008) (citations omitted). Without the entry of default judgment, Plaintiff will not be able to recover damages upon their contract with Defendants nor remedy Defendants' defamatory behavior, which has gone unabated since the filing of this action. Accordingly, the third factor supports entry of a default judgment.

### B. Merits of Plaintiff's Substantive Causes of Action and Sufficiency of the Complaint

The combination of the unchallenged allegations of the Complaint and Plaintiff's submissions in support of this motion warrant a finding of liability against Defendants on all four of its asserted causes of action.

*1.     Violation of the Lanham Act Section 43(a)(1)(B), Trade Libel and Unfair Competition*

Common issues of fact support a finding of liability on Plaintiff's first claim for violation of the Lanham Act under 15 U.S.C. § 1125(a)(1)(B), its second claim of alleging common law trade libel, and its third claim for unfair competition under New York law, to wit: Defendants published false and misleading statements about Plaintiff and Plaintiff's services. Further, the relief Plaintiff seeks herein under these claims is identical: (i) a permanent injunction against Defendant from disparaging or otherwise posting defamatory comments about Plaintiff and (ii) a directive to Defendants to undertake remedial efforts to restore Plaintiff's reputation, including but not limited to taking down and de-indexing the false defamatory statements. Plaintiff's Complaint properly alleges all three claims to support an award of the relief requested.

First, under the Lanham Act provides a remedy for trade disparagement when a defendant makes "false or misleading descriptions or false or misleading representations of fact made about one's own or another's goods or services" in "commercial advertising or promotion." *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001); *see* 15 U.S.C. § 1125(a)(1)(B). For a statement to constitute "commercial advertising or promotion," it must be: (1) commercial speech; (2) intended to "influenc[e] consumers to buy defendant's goods or services"; and (3) "disseminated sufficiently to the relevant purchasing public." *Boule v. Hutton*, 328 F.3d 84, 90 (2d Cir. 2003).

Similarly, trade libel is the "knowing publication of false matter derogatory to the [plaintiff's] business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relation with others, to its detriment." *Esbin & Alter, LLP v. Zappier*, 2011 WL 940228, at *4 (S.D.N.Y. Mar. 17, 2011); see *Chau v. Lewis,* 771 F.3d 118, 126–27 (2d Cir. 2014) (finding under New York law that trade libel is the disparagement of a

business's goods or services). Where a statement impugns the basic integrity or creditworthiness of a business, an action for trade libel lies. *Harwood Pharmacal Co. v. Nat'l Broad. Co.,* 9 N.Y.2d 460, 462–63, 214 N.Y.S.2d 725, 174 N.E.2d 602 (1961); *Bowes v. Magna Concepts, Inc.,* 166 A.D.2d 347, 349, 561 N.Y.S.2d 16 (1st Dep't 1990); *Yesner v. Spinner,* 765 F.Supp. 48, 52 (E.D.N.Y.1991) ("It has long been the law in New York that a defamatory statement that is a direct attack upon the business, trade or profession of the plaintiff is considered defamation *'per se,'* and therefore actionable without any proof of special damages."). As explained in *Prosser and Keeton on the Law of Torts* § 112, at 791 (5th ed.1984):

> [I]t is actionable without proof of damage to say of a physician that he is a butcher ..., of an attorney that he is a shyster, of a school teacher that he has been guilty of improper conduct as to his pupils, of a clergyman that he is the subject of scandalous rumors, of a chauffeur that he is habitually drinking, of a merchant that his credit is bad or that he sells adulterated goods, of a public officer that he has accepted a bribe or has used his office for corrupt purposes . . . —since these things discredit [one] in his chosen calling.

In other words, trade libel is found where statements "affect a person in his profession, trade, or business, by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof." *Grimaldi v. Schillaci,* 106 A.D.2d 728, 730, 484 N.Y.S.2d 159, 161 (3d Dep't 1984) (where a statement portrays "plaintiff as a businessman who is not entirely honest … such imputation of dishonesty could affect plaintiff in his business and, thus, constitute libel per se.").

Thus, the only functional difference between trade disparagement under the Lanham Act and trade libel under New York law is that the Lanham Act includes the additional component that the false statements be made in "commercial advertising or promotion." *See* 15 U.S.C. § 1125(a)(1)(B). Likewise, claims under New York common law unfair competition mirror claims

under the Lanham Act. *See Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005).

There is no dispute that the Defendants published the following statements:

- <u>In the Ripoff Report</u> writing under the name "NEMC – New York, New York," accusing Plaintiff of unlawfully detaining and/or stealing Defendants' funds, claims Plaintiff committed fraudulent acts to "intimidate people," i.e. extortion, and calls Plaintiff "CROOKS!!!" and "ripoff artists." Compl. at ¶ 27, Exhibit A (emphasis in original); Nguyen Decl. ¶ 8.

Falsely accusing a business or person of being a "crook", "ripoff artists" and committing extortion goes directly the heart of the "integrity" of a business or person's professional reputation, and constitutes libel *per se. See Nat'l Broad. Co.,* 9 N.Y.2d at 462–63; *Liberman v. Gelstein*, 80 N.Y.2d 429, 436, 590 N.Y.S.2d 857, 605 N.E.2d 344 (N.Y. 1992) (Reputational injury to a person's business, or to a company, consists of a statement that either imputes some form of fraud or misconduct or a general unfitness, incapacity, or inability to perform one's duties.). One could hardly conjure up words more damaging to the reputational integrity of a business.  These same statements were made clearly commercial speech as it was made by a competitor to Plaintiff, who identified itself in the article, which was and is disseminated via the Internet. *See, e.g.*, *World Wrestling Federation Entertainment v. Bozell*, 142 F. Supp. 2d 514, 525-26 (S.D.N.Y. 2001).

Plaintiff is not required to prove actual damages in a case of libel *per se. See Walia v. Vivek Purmasir & Associates, Inc.*, 160 F. Supp. 2d 380, 394 (E.D.N.Y. 2000) ("damages are presumed when the defamatory statement takes the form of slander per se."); *Ruder & Finn, Inc. v. Seaboard Sur. Co.,* 52 N.Y.2d 663, 670, 439 N.Y.S.2d 858, 422 N.E.2d 518 (N.Y. 1981)

("Where a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies and injury is conclusively presumed."). Presumed damages are not limited to "out-of-pocket loss but, rather, also include [ ] impairment of reputation and standing in the community, personal humiliation and mental anguish and suffering." *Wachs v. Winter*, 569 F.Supp. 1438, 1446 (E.D.N.Y. 1983) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974))(footnote and citation omitted).

Therefore, because a statement impugning the Plaintiff business reputations is libel *per se*, special damages need not be pled. However, in this case, Plaintiffs suffered both actual damages and reputational injury as a direct result of libelous statements made by Defendants. As a result of Defendants' defamatory statements, many customers and/or potential customers asked about the Ripoff Report, including at least one that decided not to do business with Plaintiff because of same. Nguyen Decl. ¶ 20. The estimated value of the lost contracts range in volume from $1,000 to $150,000 gross processing a week; based on TheECheck.com's 5% average fee, the estimated losses for these two clients alone was between $5,200 to $390,000 each year.. Nguyen Decl. ¶ 20.

In addition to the persons identified in the Nguyen Declaration, Plaintiffs may produce additional evidence of such customers, however, it is far from a complete list, as many complaints were not reported at the time they were made. *See id.* Other persons and companies doubtlessly read Defendants' false complaint, and opted not to do business with Plaintiff, but never called or wrote. Furthermore, Plaintiff has adequately alleged irreparable harm to its reputation warranting an award of the requested injunctive relief, to wit: de-indexing of the offending and false statements.

Finally, Plaintiff has sufficiently alleged that Defendants' actions were willful and in bad faith. Compl. ¶¶ 1, 35, 57 and 59. Defendants' conduct in posting negative reviews to consumer websites is likely to and did harm plaintiff's business. Nguyen Decl. ¶ 22. Accordingly, Plaintiff has sufficiently pled the elements of a § 1125(a)(1)(B) claim under the Lanham Act and trade libel and unfair competition under New York common law.

### 2. Tortious Interference

The fourth claim of the Complaint alleges, *inter alia*, tortious interference with prospective contractual relations. This tort applies to those situations where a third party would have entered into a contractual relationship with plaintiff but for the intentional and wrongful acts of the defendant. *See, e.g.*, *Blue Fountain Media, Inc. v. Metasense, Inc.*, 2013 NY Slip Op 31405(U), Index No. 154454/2012 (N.Y. County June 23, 2013) (*citing WFB Telecom., Inc. v. NYNEX Corp.*, 188 A.D. 2d 257 (1st Dep't 1992)). "Wrongful acts" or "'wrongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure" *Guard-Life Corp. v. Parker Hardware Mfg. Corp.*, 50 N.Y. 2d 183, 191 (1980). The Complaint adequately alleges that Defendants used wrongful means (to wit: defamation and misrepresentations) to interfere with prospective business relationships with Plaintiff's clients. *See* Compl. ¶¶ 74-80.

### 3. Breach of Merchant Agreement

Common issues of fact support a finding of liability on Plaintiff's fifth and sixth claims of the Complaint for breach of contract and unjust enrichment, to wit: Plaintiff performed and/or provided services under the parties' MSA for Defendants, $60,000 of which, to date, has not been repaid. *See* Compl. ¶¶ 82-90.

The Complaint alleges that the MSA was a valid and binding agreement between Plaintiff and defendant NEMC. Nguyen Decl. ¶ 13.  Under the MSA, Plaintiff would process electronic financial transactions on behalf of defendant NEMC (and/or its affiliates) in exchange for a processing fee, to be paid by NEMC at a later date. Nguyen Decl. ¶¶ 13-14.  Plaintiff further alleges that, pursuant to the MSA, between August 2012 and July 2012 NEMC became indebted to Plaintiff in the amount of $100,000 of processing fees, $60,000 of which remains unpaid. Nguyen Decl. ¶ 15. As such, the Court should award Plaintiff $60,000 against Defendant NEMC for its contractual breaches under the MSA.

    4.  *Breach of ISO Services Agreement and Non-solicitation*

Pursuant to the ISO Agreement, Defendants agreed to not compete with Plaintiff or interfere with Plaintiff's business or contact Plaintiff's customers.  Compl. ¶ 92-94; Nguyen Decl. ¶ 12.  By the wrongful conduct described in the Complaint, i.e. Defendants' conduct in posting negative reviews to consumer websites, Defendants improperly interfered with Plaintiff's contracts with its customers and did so with the intent and purpose of damaging Plaintiff's business. *Id.*

  **C.**  **Damages and Injunctive Relief are Necessary Remedies**

While it is possible to demonstrate some pecuniary losses attributable to Defendants' conduct, for the purpose of this motion and as to these two defendants, Plaintiff seeks only contractual, monetary damages and attorneys' fees under the MSA and injunctive relief related to Defendants' various forms of trade disparagement and unfair competition under federal and state common law.  Because Defendants' wrongful acts were so public and widespread, Plaintiff may never know their true extent.

Plaintiff's requests for contractual damages of $60,000 under the MSA against NEMC are supported by the allegations in the complaint and the Nguyen Declaration. Compl. at ¶ 49, Exhibit C; Nguyen Decl. ¶ 15.

Further, Paragraph 8.14 of the ISO Services Agreement, entitled "Attorney's Fees" provides that the prevailing party "in any action [concerning the] obligations hereunder" . . . "shall be entitled to recover its reasonable attorneys' fees and costs of suit from the other party." *See* Compl., Exhibit B. Thus, an award of Plaintiff's attorneys' fees against Cyberbox under the ISO is also warranted.

The Court should also enjoin Defendants from defaming Plaintiff or direct Defendants to undertake remedial efforts to repair Plaintiff's reputation, to wit: taking down and de-indexing the false defamatory statements. Pursuant to 15 U.S.C. § 1116(a), the Court may grant injunctions to prevent violations of 11 U.S.C. § 1125(a). *See Dor Yeshurim, Inc. v. A Torah Infertility Mediaum of Exch.*, 2011 WL 7285038, at *3 (E.D.N.Y. Aug. 10, 2011), report and recommendation adopted, 2012 WL 464000 (E.D.N.Y. Feb. 10, 2012); *see also Lyons P'Ship, L.P. v. D & L Amusement & Entm't, Inc.*, 702 F. Supp. 2d 104, 118 (E.D.N.Y. 2010) (finding that, under the Lanham Act, a court has the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable"). Defendant continues to enjoy reputational advantages from its long association with the negative review of Plaintiff, that it might continue to exploit short of judicial intervention. Further, there is no public interest in denying an injunction; rather, injunctive relief would best serve the public interest. *See Reckitt Benckiser, Inc. v. Motomco Ltd.*, 760 F.Supp.2d 446, 456-57 (S.D.N.Y. 2011).

Finally, damages in tortious interference are not limited to the value of the contract breached or opportunity lost due to a defendant's wrongful meddling, and can include recovery

of all losses that are proximately caused by the interference, including "actual harm to reputation if they are reasonably to be expected to result from the interference." *Guard-Life*, 50 N.Y. 2d at 190-91. As stated above, Defendants' conduct in posting negative reviews to consumer websites is likely to and did harm plaintiff's business. Nguyen Decl. ¶ 22. Thus, taking down and de-indexing the false defamatory statements are very conservative requests to recover and/or remediate reputational losses associated with Defendants' wrongful conduct.

## CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that this Court enter default judgment against Defendants NEMC FINANCIAL SERVICES GROUP INC. and CYBERBOX TECHONOLOGY, INC. and issue an Order awarding (i) judgment against Defendant NEMC under the MSA and in favor of Plaintiff in the amount of $60,000 with interest thereon from July 30, 2012, (ii) a permanent injunction against both Defendants from disparaging or otherwise posting defamatory comments about Plaintiff, (iii) a directive to both Defendants to undertake remedial efforts to restore Plaintiff's reputation, including but not limited to taking down and de-indexing the false defamatory statements, (iv) attorneys' fees and costs against Cyberbox under the ISO Agreement, and (v) such other relief as the Court deems just and proper.

Dated: Brooklyn, New York
March 7, 2017

                                        Respectfully submitted,

                                      LEWIS & LIN, LLC

                                      By: */s/ Justin Mercer*
                                          David D. Lin
                                          Justin Mercer
                                      45 Main Street, Suite 608
                                      Brooklyn, NY 11201
                                      Tel: (718) 243-9323
                                      Fax: (718) 243-9326

Email: David@iLawco.com
Justin@iLawco.com

*Counsel for Plaintiffs*